# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 21-349

**NICOL EDWARD HANNIE**

**VERSUS**

**COLONIAL OAKS AL LAFAYETTE EMPLOYER, LLC, ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20202779
HONORABLE EDWARD B. BROUSSARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Chief Judge, Van H. Kyzar, and J. Larry Vidrine,* Judges.

**REVERSED IN PART AND RENDERED;
AND AFFIRMED IN PART.**

---

* Honorable J. Larry Vidrine participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

Gregory J. Logan
The Logan Law Firm
P. O. Box 52704
Lafayette, LA 70505
(337) 406-9685
COUNSEL FOR PLAINTIF/DEFENDANT IN
RECONVENTION/APPELLANT/APPELLEE:
    Nicol Edward Hannie

Eric R. Miller
Elizabetbh Bailly Bloch
The Kullman Firm, APLC
4605 BlueBonnet Boulevard, Suite A
Baton Rouge, LA 70809
(225) 906-4250
COUNSEL FOR DEFENDANT/PLAINTIFF IN
RECONVENTION/APPELLEE/APPELLANT:
    Colonial Oaks AL Lafayette Employer, LLC
    Colonial Oaks Senior Living Employer, LLC

**KYZAR, Judge.**

Both the plaintiff/defendant in reconvention, Nicol Edward Hannie, and the defendant/plaintiff in reconvention, Colonial Oaks AL Lafayette Employer, LLC, appeal from the trial court judgment awarding Mr. Hannie his unpaid accrued vacation/sick leave pay, together with penalty wages and attorney fees pursuant to La.R.S. 23:631 and La.R.S. 23:632. For the reasons set forth, we reverse in part and render judgment and affirm in part.

## FACTS AND PROCEDURAL HISTORY

The background of this dispute stems from the sale of two assisted-living facilities located in Lafayette, Louisiana: Rosewood Retirement & Assisted Living Community (Rosewood) and Cedar Crest Memory Care (Cedar Crest). Mr. Hannie was a minority shareholder of Hannie Development, Inc. (Hannie Development), the owner and operator of Rosewood, as well as Cedar Crest, LLC, the owner and operator of Cedar Crest. Mr. Hannie had also been employed as Rosewood's director since its inception.

The buyers and subsequent operators of these facilities were all companies owned and operated by Carl Mittendorff: Seniors Investments II, LLC (Seniors Investments); Colonial Oaks Assisted Living Lafayette, LLC; Colonial Oaks Memory Care Lafayette, LLC; Colonial Oaks Senior Living, LLC; Colonial Oaks AL Lafayette Employer, LLC (Colonial Oaks AL); Colonial Oaks MC Lafayette Employer, LLC (Colonial Oaks MC); and Colonial Oaks Senior Living Employer, LLC (Colonial Oaks SL). In the proceedings below, the parties were not clear as to the exact involvement of each of these entities in the transactions and subsequent operations of these facilities. Adding to the confusion is the fact that the names of six of these entities began with "Colonial Oaks."

On March 31, 2016, Seniors Investments entered into an asset purchase agreement (APA) with Hannie Development for the purchase of Rosewood for $10,642,500.00. It entered into a similar agreement with Cedar Crest, LLC for the purchase Cedar Crest for $5,857,500.00. As part of the APAs, the parties agreed to enter into "holdback escrow agreements" (HEAs), whereby Hannie Development and Cedar Crest, LLC (collectively referred to as "the sellers") would deposit four percent of the gross purchase price into an escrow account, which funds were to be held for a period of one year from the date of closing, a period known as the survival period. These funds were to be held as security against any breach of a survival-period obligation by the sellers that was raised by the buyers. In addition to the outlined procedures for accessing the escrow funds, the HEAs provided that the parties would resolve any disputes through non-binding mediation or, if unsuccessful, through final, binding arbitration.

Although Seniors Investments executed the APAs as the buyer in both agreements, it is not clear whether it remained the buyer in both transactions at the December 1, 2016 closing. In the federal litigation spawned by these transactions, Colonial Oaks Assisted Living Lafayette, LLC and Colonial Oaks Memory Care Lafayette, LLC sued the sellers and their representatives, alleging claims for breach of contract and breach of representations or warranties under the terms of the APAs. *Colonial Oaks Assisted Living Lafayette, L.L.C. v. Hannie Dev., Inc.*, 972 F.3d 684 (5th Cir. 2020). In the fifth circuit opinion, Colonial Oaks Assisted Living Lafayette, LLC was identified as the buyer of Rosewood, and Colonial Oaks Memory Care Lafayette, LLC was identified as the buyer of Cedar Crest. Moreover, in a prior arbitration proceeding,[1] the parties stipulated that Seniors

---

[1] *Hannie Development, Inc. and Cedar Crest, LLC v. Colonial Oaks Assisted Living Lafayette LLC and Colonial Oaks Memory Care Lafayette, LLC*, AAA Case No. 0114-8-0-002-

Investments assigned its rights as buyer under the Rosewood APA to Colonial Oaks Assisted Living Lafayette, LLC, and its rights under the Cedar Crest APA to Colonial Oaks Memory Care Lafayette, LLC. Thus, we will refer to Colonial Oaks Assisted Living Lafayette, LLC and Colonial Oaks Memory Care Lafayette, LLC, collectively, as the buyers.

The instant appeal arises from a suit filed by Mr. Hannie on June 11, 2020, against Colonial Oaks AL and Colonial Oaks SL (referred to collectively as Colonial Oaks AL/SL). The action was brought as a summary proceeding pursuant to the Louisiana Wage Payment Act, La.R.S. 23:631, et seq., which authorizes the use of summary proceedings to enforce claims for unpaid wages. In his petition, Mr. Hannie alleged that his employment as Rosewood's director continued after its acquisition by Colonial Oaks AL/SL,[2] but that he was reassigned to the position of community relations director two months later. He alleged that he resigned as community relations director on May 31, 2017, and requested a transfer to another position within the company. He asserted that rather than reassign him, Colonial Oaks AL/SL terminated his employment. Mr. Hannie alleged that pursuant to the employee handbook that governed his employment, he was owed accrued sick leave and vacation pay upon his termination.

Mr. Hannie further alleged that Colonial Oaks AL/SL had "filed a claim against its predecessor owner and claimed an offset reimbursement for a substantial amount related to [his] accrued sick leave and vacation time." He asserted that as a result of Colonial Oaks AL/SL's failure to pay him the amounts due, he retained legal counsel and incurred legal fees and expenses. Thus, he

---

104. AAA is the acronym for the American Arbitration Association.

[2] As previously stated, Rosewood was actually acquired by Colonial Oaks Assisted Living Lafayette, LLC.

3

asserted that he was entitled to payment for his accrued sick leave and vacation time, penalty wages, attorney fees, costs, judicial interest, and any other legal and equitable relief found just and proper.

In response, Colonial Oaks AL/SL filed multiple exceptions, an answer, and a reconventional demand. The exceptions included peremptory exceptions of res judicata and no cause of action and dilatory exceptions of unauthorized use of summary proceedings and arbitrability.[3] In its answer, Colonial Oaks AL/SL admitted that Mr. Hannie was previously an employee of Colonial Oaks AL, but denied that he was employed by Colonial Oaks SL. It further admitted that Mr. Hannie was terminated from his employment on May 31, 2017.

The matter was heard on November 2, 2020. Following the hearing on the exceptions, the trial court denied Colonial Oaks AL/SL's exceptions of res judicata, unauthorized use of summary proceeding, no cause of action, and arbitrability. Thereafter, the matter proceeded to a trial on the merits, after which the trial court took the matter under advisement. On November 23, 2020, the trial court rendered written reasons for judgment, granting judgment in favor of Mr. Hannie and against Colonial Oaks AL[4] and awarding Mr. Hannie $18,153.44 in accrued vacation/sick leave, $35,517.60 in penalty wages, and $9,000.00 in attorney's fees for a total award of $62,671.04. A written judgment was rendered on December 29, 2020. Both parties have appealed from this judgment.

In its appeal, Colonial Oaks AL asserts the following assignments of error:

1.    [T]he trial court err[ed] in overruling Colonial Oaks AL's peremptory exception of *res judicata* under Louisiana Code of

---

[3] Colonial Oaks AL/SL also filed a peremptory exception of prescription, which it later voluntarily dismissed.

[4] Although the judgment prepared by Mr. Hannie's counsel was against both Colonial Oaks AL and Colonial Oaks MC, the trial court struck through Colonial Oaks MC's name. Thus, the judgment was only rendered against Colonial Oaks AL.

4

Civil Procedure Article 927(A)(3) and Louisiana Revised Statute 13:4231[.]

2.    [T]he trial court err[ed] in overruling Colonial Oaks AL's dilatory exception of unauthorized use of summary proceeding under La. C.C.P. art. 926(A)(3)[.]

3.    [T]he trial court err[ed] in overruling Colonial Oaks AL's declinatory exception of arbitrability under La. C.C.P. art. 925(A)(6)[.]

4.    [T]he trial court err[ed] in awarding judgment in favor of [Mr.] Hannie for unpaid wages under La. R.S. 23:631[.]

5.    [T]he trial court err[ed] in awarding judgment in favor of [Mr.] Hannie for penalty wages under La. R.S. 23:632(A)[.]

6.    [T]he trial court err[ed] in awarding judgment in favor of [Mr.] Hannie for attorney's fees under La. R.S. 23:632(C)[.]

On appeal, Mr. Hannie asserts three assignments of error, as follows:

1.    The district court made an erroneous factual determination in determining that [Colonial Oaks SL] was not an employer of [Mr.] Hannie.

2.    The district court erred as a matter of law in attempting to cast an unnamed defendant, [Colonial Oaks MC,] in place of named defendant [Colonial Oaks SL] when the named defendant had sent an employment offer and had issued the majority of the paychecks representing the majority of [Mr. Hannie's] salary during his employment with Colonial Oaks.

3.    The district court erred in omitting a named party from the Judgment, [Colonial Oaks SL], from solidary liability when it and the other defendants acted as a single business enterprise, and it paid [Mr.] Hannie['s] wages.

## OPINION

### *Res Judicata*

We will first address Colonial Oak AL's appeal as several of its assignments of error, if found to be meritorious, would result in a reversal of the trial court's judgment, mooting all other issues.

In its first assignment of error, Colonial Oaks AL argues that the trial court erred in overruling its peremptory exception of res judicata because the prior

5

arbitration dispute involving the sellers and the buyers resolved the dispute between Mr. Hannie and Colonial Oaks AL/SL as to his entitlement to his accrued vacation/sick leave benefits.

Louisiana Revised Statutes 13:4231 provides for the doctrine of res judicata and forms the basis for the peremptory exception thereof in a subsequent action between the parties.

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> (1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
>
> (2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
>
> (3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.

Appellate review of the exception requires a determination of whether the trial court's decision was legally correct. *McCalmont v. McCalmont*, 19-738 (La.App. 3 Cir. 4/29/20), 297 So.3d 1057. "The burden of proof is upon the pleader to establish the essential facts to sustain the plea of res judicata." *Ins. Assocs., Inc. v. Francis Camel Constr., Inc.*, 95-1955, p. 3 (La.App. 1 Cir. 5/10/96), 673 So.2d 687, 689. At the hearing on the exception, "evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition." La.Code Civ.P. art. 931. When evidence is introduced in support of the exception, "the trial court's factual findings are

reviewed pursuant to the manifest error—clearly wrong standard of review." *Richard v. Taylor*, 15-681, p. 7 (La.App. 3 Cir. 12/9/15), 179 So.3d 975, 981.

Colonial Oaks AL/SL introduced the following evidence in support of its exceptions: the Cedar Crest APA,[5] which included the arbitration provisions; Rosewood's employee handbook (the Handbook); and excerpts from the arbitrator's April 25, 2019 partial final award (arbitration ruling) and Mr. Hannie's testimony from that proceeding.

At the close of the hearing, the trial court orally denied Colonial Oaks AL/SL's res judicata exception after finding that Mr. Hannie was not a party to the arbitration proceeding. In its written reasons, the trial court reiterated this finding in addition to finding that "there was no evidence that the arbitrator's partial final award had been confirmed by a court, as contemplated by La.R.S. 9:4212."

While we agree that Mr. Hannie was not a party to the arbitration proceeding, we further find that neither Colonial Oaks AL/SL were parties to that proceeding. As stated by the supreme court, in *Khammash v. Clark*, 13-1564, p. 15 (La. 5/7/14), 145 So.3d 246, 257, "a previous judgment can only preclude an issue against a party that actually participated in the litigation[.]" According to both the arbitration ruling and the fifth circuit opinion, the parties involved in those matters were Hannie Development, Cedar Crest, LLC, Colonial Oaks Assisted Living Lafayette, LLC, and Colonial Oaks Memory Care Lafayette, LLC. Moreover, in taking judicial notice of the Louisiana Secretary of State's website, as allowed by La.Code Evid. art. 201, we note that Colonial Oaks Assisted Living Lafayette, LLC, Colonial Oaks Memory Care Lafayette, LLC, Colonial Oaks Senior Living,

---

[5] Because the APAs were basically identical, Colonial Oaks introduced only one agreement.

7

LLC, Colonial Oaks AL, Colonial Oaks MC, and Colonial Oaks SL are all separate entities with which Mr. Mittendorff is involved.

Based on our finding that none of the parties involved in this matter were parties to the arbitration proceeding, we affirm the trial court's denial of Colonial Oaks' peremptory exception of res judicata.

### Lack of Subject Matter Jurisdiction

In its third assignment, Colonial Oaks AL argues that the trial court erred in denying its declinatory exception of lack of subject matter jurisdiction because Mr. Hannie's claim for unpaid wages originated from the APAs, which are governed by arbitration. We disagree.

In *Collins v. Prudential Insurance Co. of America*, 99-1423, pp. 9-10 (La. 1/19/00), 752 So.2d 825, the supreme court determined that before a district court grants an exception or stays a proceeding to require arbitration, it must make two preliminary determinations: "First, the trial judge must ensure that a valid arbitration agreement between the parties exists. Second, the judge must decide whether the dispute at issue falls within the scope of the agreement." *Id.* at 831.

> It is "well-settled" law that "the existence of a contract is a finding of fact, subject to the manifest error standard of review." *Mark A. Gravel Props., LLC v. Eddie's BBQ, LLC*, 14-46, p. 7 (La.App. 3 Cir. 5/7/14), 139 So.3d 653, 658, (citing *Dubois Const. Co. v. Moncla Const. Co., Inc.*, 39,794 (La.App. 2 Cir. 6/29/05), 907 So.2d 855). Thus, this court cannot set aside the trial court's finding that no contract existed between these parties unless we find the trial court was clearly wrong or manifestly erroneous. *Coffman Homes, L.L.C. v. Sutherland*, 10-178 (La.App. 5 Cir. 2/15/11), 60 So.3d 52, *writ denied*, 11-10111 (La.6/24/11), 64 So.3d 223.

*Bayou Rapides Corp. v. Dole*, 14-906, pp. 5-6 (La.App. 3 Cir. 5/27/15), 165 So.3d 373, 377.

Based on our finding that Rosewood/Cedar Crest were actually purchased by Colonial Oaks Assisted Living Lafayette, LLC/Colonial Oaks Memory Care Lafayette, LLC, we find that neither Mr. Hannie nor Colonial Oaks AL/ SL were

8

bound by the APAs' arbitration provisions. While Mr. Hannie may have testified in the arbitration proceeding, no evidence established that he was a party to the APAs or that he agreed to be bound, individually, by their terms. Furthermore, although Mr. Mittendorff and his counsel never specifically identified the actual buyers of Rosewood/Cedar Crest, Mr. Mittendorff, when testifying as Colonial Oaks AL/SL's representative, stated, "We never actually owned the Lafayette properties."

In its reasons for judgment, the trial court stated that it "overruled Colonial Oaks' exceptions based on the asset purchase agreement, because Mr. Hannie was not a party to the agreement, and there is no evidence to support 'piercing the corporate veil.'" As we previously determined, none of the parties in this matter were signatories to the APAs. Accordingly, it was not manifest error for the trial court to find that no valid contract of arbitration existed between the parties. The judgment of trial court denying the exception of lack of subject matter is affirmed.

## *Use of Summary Proceedings*

In its second assignment of error, Colonial Oaks AL asserts that the trial court erred in overruling its dilatory exception of unauthorized use of summary proceeding. In arguing that the use of summary proceedings was inappropriate in this instance, Colonial Oaks AL again asserts that the APAs' provisions govern this matter, and because this matter involves contract interpretation and application, the rules of ordinary proceedings apply.

Specifically, Colonial Oaks AL asserts that rather than being an action to recover unpaid wages, "Hannie's request for unpaid wages is governed by terms of the APAs between Cedar Crest and Seniors Investments II, and between [Hannie Development] and Seniors Investments II, sale contracts of which the [sic] Hannie was a party." It further argues, "Additionally, the HEAs attached to these contracts

9

controlled whether Hannie was due any unpaid wages by his prior employer before Senior Investments II acquired Rosewood and Cedar Crest."

The procedural rules applicable in summary proceedings are found in La.Code Civ.P. arts. 2591-2596. Summary proceeding are ones "which are conducted with rapidity, within the delays allowed by the court, and without citation and the observance of all the formalities required in ordinary proceedings." La.Code Civ.P. art. 2592. Although La.Code Civ.P. art. 2591 sets out twelve specific situations in which summary proceedings are appropriate, it further provides that summary proceedings are appropriate in "[a]ll other matters in which the law permits summary proceedings to be used." La.Code Civ.P. art. 2592(13). Summary proceedings are specifically authorized for claims involving unpaid wages. La.R.S. 23:631(B). As Mr. Hannie's suit raises a claim for unpaid wages, we find no error in the trial court's denial of Colonial Oaks AL/SL's dilatory exception of unauthorized use of summary proceedings.

### *Unpaid Wages, Penalty Wages, and Attorney Fees*

In its fourth, fifth, and sixth assignments of error numbers, Colonial Oaks AL argues that the trial court erred in finding that Mr. Hannie was entitled to $18,153.44 in unpaid wages, $35,517.60 in penalty wages, and $9,000.00 in attorney fees. As each of these issues revolve around the propriety of the award for unpaid wages, we will address them together.

Colonial Oaks AL first argues that the trial court erred by awarding Mr. Hannie $18,153.44 in unpaid wages for the vacation/sick leave accrued by him during his employment with Hannie Development. It argues that pursuant to the Rosewood APA and a November 30, 2016 letter, Mr. Hannie's employment with Hannie Development terminated effective that date, whereupon he started a new term of employment with it on December 1, 2016, and, as such, was subject to its

10

employee policies.[6] Colonial Oaks AL further argues that although it adopted the Handbook in the absence of its own handbook, Mr. Hannie, as a new employee, was not entitled to accrued vacation/sick leave because his employment started anew and lasted less than a year before his resignation.[7]

> The Louisiana Wage Payment Act, La. R.S. 23:631, et seq., is designed to compel prompt payment of earned wages upon an employee's discharge or resignation. Molina v. Oilfield Production Contractors, Inc., 17-0455, p. 2 (La. App. 1st Cir. 12/29/17), 241 So.3d 337, 2017 WL 6629235. The main purpose of the wage payment law is to compel an employer to pay the earned wages of an employee promptly after his dismissal or resignation and to protect discharged employees from unfair and dilatory wage practices of employers. Molina, 17-0455 at p. 3, 241 So.3d at 339.
>
> Specifically, La. R.S. 23:631(A)(1)(a) provides that upon discharge of an employee, the employer shall "pay the amount then due under the terms of employment . . . on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first." Furthermore, any employer who fails or refuses to comply with the provisions of La. R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay or full wages from the time the employee demands payment until the employer pays or tenders the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. La. R.S. 23:632(A).
>
> Accordingly, to prove entitlement to penalty wages under La. R.S. 23:632, the employee must prove: (1) that wages were due and owing, (2) that demand for payment was made at the place where the employee was usually paid, and (3) that the employer failed to pay upon demand. Kern v. River City Ford, Inc., 98-0407, pp. 8-9 (La. App. 1st Cir. 2/19/99), 754 So.2d 978, 983. Louisiana Revised Statute 23:632 is penal in nature and, therefore, must be strictly construed. Pokey v. Five L Investments, Inc., 96-0018, p. 5 (La. App. 1st Cir. 9/27/96), 681 So.2d 489, 492.

*Haber v. Ocean Canyon Properties, Inc.*, 17-1472, p. 5 (La.App. 1 Cir. 5/31/18), 251 So.3d 454, 458.

---

[6] However, the letter states that all of the sellers' employees would be employed by Colonial Oaks SL, which was identified as Mr. Mittendorff's management company.

[7] Colonial Oaks AL asserts that Mr. Hannie resigned from his employment, whereas Mr. Hannie claims that his employment was terminated. Whether Mr. Hannie resigned or was terminated is irrelevant under La.R.S. 23:631(A), as an employee is entitled to unpaid wages in either situation.

11

The amount due an employee in unpaid wages includes accrued vacation pay if, pursuant to the employer's vacation policy, the employee is "eligible for and has accrued the right to take vacation time with pay[]" but "has not taken or been compensated for the vacation time as of the date of the discharge or resignation." La.R.S. 23:631(D)(1). A trial court's determination that unpaid wages, penalty wages, or attorney fees are due an employee are findings of fact that will not be reversed on appeal absent manifest error or unless its finding is clearly wrong. *Red Ball Oxygen, Inc. v. Swilley*, 11-787 (La.App. 3 Cir. 12/7/11), 82 So.3d 360.

> However, where one or more legal errors interdict the fact-finding process, the manifest error standard no longer applies. *Campo v. Correa*, 2001-2707 (La. 6/21/02), 828 So. 2d 502, 510. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731, 735. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts *de novo*. *Id.*

*Brehm v. Amacker*, 19-1452, pp. 6-7 (La.App. 1 Cir. 9/21/20), 314 So.3d 58, 62, *writ denied*, 20-1224 (La. 1/26/21), 309 So.3d 343.

Mr. Mittendorff, the chief executive officer, representative, and manager of both Colonial Oaks AL/SL, never identified the actual buyers of Rosewood/Cedar Crest, although he testified that they were purchased by an affiliated company owned by him. He further stated that as the buyers' authorized representative, he negotiated the terms of the APAs with Mr. Hannie's brother, Maurice, but that Mr. Hannie was in on every call during the negotiations.

According to Mr. Mittendorff, the APAs required the sellers to deposit four percent of the purchase price into HEAs, which would be administered by third-party escrow agents. He stated that the deposited amounts from both sales, totaling $616,000.00, was to be held as security against any claims raised by the buyers

12

subsequent to the transactions' closing date. He stated that the APAs further required that the "seller was to give buyer a credit for all of the approved employee benefit costs." The APAs defined accrued employee benefits as "[a]ccrued vacation, sick time, and other approved paid time off which information shall be provided by seller on a schedule within ten (10) business days of the effective date . . . related to hired employees, if any, with respect to which Buyer receives a credit in accordance with the provisions of Section 6.3 (g) hereof."

Mr. Mittendorff testified that the November 30, 2016 letter, which he described as a form letter, was sent to all of the sellers' employees, informing them about the December 1, 2016 transfer of ownership. The letter, which was sent out by Colonial Oaks Senior Living, LLC, provided:

> In connection with this transition, you will be terminated effective immediately from your existing employer, however, we are pleased to offer you (as well as all other employees) the same position within Colonial Oaks Senior Living Employer, LLC. Your employment will be automatically transitioned without interruption. Additionally, you are eligible for paid time off and other leave in accordance with the company's normal practices and policies.

In regard to the letter, the following colloquy occurred between Colonial Oaks AL/SL's counsel and Mr. Mittendorff:

> Q. In the second paragraph, the last sentence indicates, additionally, you're eligible for paid time off and other leave in accordance with the company's normal practices and policies?
>
> A. This is a form letter.
>
> Q. Which company are you referring to? Is that Colonial, the new employer or the old employer?
>
> A. The new employer. This is a form letter. We make it explicitly clear to employees that we intend to honor their tenure and their existing accrued vacation and time off, et cetera because remember, these are all new employees for us.
>
> So in this case, we did not state that we would be giving any credit to any employees' accrued benefits. And that was a business decision we had a right to make and we made it. In

13

the policy, only one that knew because of his position as the seller, that we actually got a credit from the buyer for those benefits. This was a transaction. There were a lot of debits/credits from a business prospective.

This was the letter that made it very clear to employees that we will let them know what our benefits plan is. And it's going to be in accordance with our company normal practices, not the seller's and not their former employer's practices.

Mr. Mittendorff testified that had Colonial Oaks AL intended to honor the benefits accrued by these employees from their prior employment, it would have said so in the letter. He stated that when the employees were terminated by the sellers, "anything that they had as an arrangement with that employer was the seller's business." With regard to their employment with the buyers, he further testified:

[W]e rehired them the date that we took over. And we actually rehired them under two specific Louisiana entities – employers for multiple reasons, including Louisiana insurance purposes. And we notified all of the employees of that and they saw that on their check. Before, it was a very – I think the only – rare exceptions that because we had to allocate them between the two communities, that we actually, for a time period – but he was never an employee of that company. He was an employee of the Rosewood/Cedar Crest employers.

Mr. Mittendorff testified that subsequent to the closing, the buyers entered into arbitration with the sellers pertaining, in part, to their failure to pay the accrued-employee-benefit credit. He said that one of the issues in that proceeding was whether the buyers were entitled to a credit for the excessive amount of vacation/sick leave accrued by Mr. Hannie prior to the sale. He claimed that prior to the sale, Mr. Hannie directed that his accrued vacation/sick leave hours be increased to more than he was otherwise eligible for under the Handbook.

The Handbook contained the following vacation/sick leave and termination policies:

14

VACATION - At the end of one year of continuous employment, employees will be eligible for a paid vacation of 1 week. At the end of two years of continuous employment, employees will be eligible for 2 weeks paid vacation. At the end of five years of continuous employment, employees will be eligible for three weeks paid vacation. Vacation must be taken within the year after vacation time is earned and cannot be caried over to following year. Vacation time is capped at 3 weeks for all employees. Timing of vacations is the responsibility of the supervisor, however, requests for vacation dates will be honored whenever possible. Each employee is expected to take the vacation time earned and additional salary will not be paid in lieu of vacation.

. . . .

SICK LEAVE – After 3 months of full time employment employees are eligible for sick leave at the rate of 1/2 day per month. Sick days may be accumulated up to 36 days.

> Bonus: Sick leave in excess of 36 days may be converted to vacation days at a rate of 2 sick leave days for 1 vacation day (not to exceed 5 vacation days per year).

. . . .

5. Sick leave will not be paid as terminal leave.

. . . .

TERMINATION:

An employee is expected to present written notice of resignation to his/her supervisor at least 2 weeks before the termination date. Failure to give proper notice may result in forfeiture of accrued vacation allowances. Accrued vacation benefits, when applicable, will be paid.

Mr. Mittendorff testified that the policy capped the amount of vacation an employee could accrue based on the length of their employment:

> There's caps on it, depending on how long you worked for seller. And basically, as a buyer, what this boils down to is how much money we get from the seller in our pocket as the buyer. And then we make a separate business decision with respect to the new hires and the new employees going forth.
>
> So what this boiled down to really was understanding what the current employees' benefits were and then knowing where they're going to vary between what we choose to offer our future employees when we hire them and our benefit package includes how much

15

vacation they get. So for us, we understood their handbook was – and that amounts to a number the seller gives the buyer and we make the decisions for the employees going forward.

According to the April 7, 2016 Paid Time Off List provided by the sellers to the buyers, Mr. Hannie had accrued 852 vacation hours and 332.70 sick leave hours.

Mr. Mittendorff testified that although the arbitrator found that the seller owed the buyer a credit for the total amount of accrued employee benefits, the amount owed for Mr. Hannie's accrued benefits was reduced from $61,302.39 to $20,126.64, after his vacation/sick leave were reduced to 120 hours and 288 hours, respectively, the maximum allowed by the Handbook. He further testified that although the arbitrator held that the sellers owed the buyers a credit for the accrued employee benefits, he never found that the buyers owed Mr. Hannie his accrued employee benefits. He stated:

> Mr. Hannie isn't due any of the accrued vacation and sick leave because the buyer and seller reached economic terms in the agreement. That's completely separate. There's no obligations under the APA for the buyer to have paid out any employee benefits to employees. There's no obligation in the APA. It's a separate transaction. And you're aware of that. These are separate transactions. When we offered Nicol Hannie employment, we offered him employment on certain terms. What we chose to do is honor the handbook, but treated him as a new employee. So his employment started with us Day 1. I think it's December 4th, 2016. He didn't work for us for twenty-two years.

Mr. Mittendorff testified that Mr. Hannie was hired by Colonial Oaks AL and Colonial Oaks MC (referred to collectively as Colonial Oaks AL/MC) after the closing and that he divided his time between those two entities. He stated that Mr. Hannie was never employed by Colonial Oaks SL, although he was supervised by Colonial Oaks SL employees. He claimed that Mr. Hannie resigned on June 1, 2017, after he was informed by his supervisors "that he was not being efficacious to his job." He stated that as of that date, Mr. Hannie had not accrued any vacation/sick leave hours.

16

Although Mr. Mittendorff initially claimed that Mr. Hannie's employment was governed by Colonial Oaks AL/MC's own employee handbook, he admitted that no such handbook existed and that Mr. Hannie's employment was governed by the Handbook, which Colonial Oaks AL/MC adopted. He further stated that even though Colonial Oaks AL/MC utilized the Handbook, Mr. Hannie was still considered a new employee, who had not accrued any vacation/sick leave hours prior to his resignation.

Mr. Mittendorff claimed that although Mr. Hannie's first seven paychecks were issued by Colonial Oaks SL, he was never employed by it. He stated that Colonial Oaks SL "paid his payroll out of that account for accounting purposes so that they could then allocate them to his actual employer[s]," Colonial Oaks AL/MC. He further admitted that Mr. Hannie received forty hours of vacation pay in his December 30, 2016 paycheck. When asked why Mr. Hannie received vacation pay despite being a new employee, he stated, "We do quite often pay over and above our handbook policies for multiple employees." He continued, "We'll often pay bonuses that are out [sic] on a bonus schedule. And we'll often let people take time off if they're going through a personal crisis or personal situations that are outside and above the handbook. The handbook is the handbook. We can do more than that for any employee who used it."

Mr. Hannie testified that he, along with his father and brother, started Rosewood in 1996, and that he was a minority shareholder in both Rosewood and Cedar Crest. He stated that he was also employed as Rosewood's director until its sale and that he continued in that position after the sale until he was named the community relations director for both Rosewood and Cedar Crest. Mr. Hannie testified that his employment with Colonial Oaks AL/SL lasted through June 1, 2017. Although his petition alleged that Colonial Oaks AL/SL terminated his

17

employment after refusing to transfer him to another position, he testified, at trial, that he resigned from his employment. He stated that he was earning $49.33 per hour when he resigned.

Based on the April 7, 2016 Paid Time Off List, Mr. Hannie testified that he had accrued 852 vacation hours and 332.70 sick leave hours by the end of his employment with Hannie Development. He denied that these numbers were manipulated to increase his hours, as claimed by Mr. Mittendorff. He explained that he never took vacation during his tenure with Rosewood, and he claimed that Hannie Development's computer program continuously rolled his vacation/sick leave hours over every year. He further denied that he took vacation but failed to report his hours. Mr. Hannie testified that although the arbitrator reduced his accrued vacation/sick leave hours, no determination was made that he improperly manipulated his hours prior to the sale. He stated that the buyers received a credit from the sellers for the amount of accrued employee benefits recognized by the arbitrator. During the arbitration proceeding, Mr. Hannie admitted that the Handbook, which he wrote, capped an employee's accrued vacation time at three weeks and, although it paid accrued vacation at termination of employment, it did not pay accrued sick leave at termination.

Mr. Hannie testified he received the November 30, 2016 letter from the buyer regarding continuing employment. He stated that he interpreted the letter to mean that his eligibility for paid time off or leave was in accordance with the practices and procedures contained in the Handbook, rather than Colonial Oaks AL/SL's handbook. Mr. Hannie testified that he would not have accepted employment with Colonial Oaks AL/SL had it not agreed to recognize his accrued vacation/sick leave. He said that had that occurred, he would have expected Hannie Development to pay him his accrued benefits when his employment with it

18

terminated. He stated that it was his understanding as of the date of the trial, that the sellers' employees were terminated and then hired by the buyers.

Mr. Hannie testified that Colonial Oaks AL/SL paid him for forty hours of vacation in December 2016. He admitted that Mr. Mittendorff gave him permission to take the vacation because it had already been planned. Thus, he admitted that as he was paid for these hours, Colonial Oaks should only have received a credit of $20,126.00 for his accrued benefits. He further stated that Colonial Oaks AL/SL never provided him with its own employee handbook during his employment.

Mr. Hannie testified that under the Handbook, an employee received one week of paid vacation after one year of employment, two weeks of paid vacation after two years of employment, and three weeks of paid vacation after five years of employment. He agreed that the Handbook prevented an employee from rolling his unused vacation time over to the next year; an employee's vacation was capped at three weeks; and an employee was only entitled to three weeks of paid vacation upon termination, as long their vacation hours had not been used.

In reviewing his Colonial Oaks AL/SL work calendar, Mr. Hannie was questioned regarding those dates that listed no appointments. He admitted that there were many days during his five months of employment in 2017, where his calendar contained no written appointments.

After taking the matter under advisement, the trial court issued written reasons for judgment on November 23, 2020. Based on the evidence, the trial court held that the employment of the sellers' employees continued with the buyers without interruption pursuant to the policies and procedures contained in the Handbook. As there was no employment contract between Mr. Hannie and Colonial Oaks AL/SL, the trial court stated that it found the APAs and the

19

arbitrator's findings instructive. Although it found that a preponderance of the evidence supported the arbitrator's credit of $20,126.64 for Mr. Hannie's accrued employee benefits, the trial court reduced that amount to $18,153.44 based on Mr. Hannie's use of forty hours of vacation early in his employment with Colonial Oaks AL/MC. It further held that Colonial Oaks AL/MC acted in bad faith in its refusal to pay Mr. Hannie's accrued employee benefits; thus, it awarded Mr. Hannie $35,517.60 in penalty wages pursuant to La.R.S. 23:632. In making this award, the trial court rejected Colonial Oaks AL/SL's argument that this award was improper in the absence of a demand for payment by Mr. Hannie. It held that the demand language relied on by Colonial Oaks AL/SL was removed from La.R.S. 23:632 by an earlier amendment. Finally, the trial court awarded Mr. Hannie $9,000.00 in attorney fees pursuant to La.R.S. 23:632(C).

*Vacation*

It is undisputed that upon termination by the sellers, their employees "automatically transitioned without interruption" to employment with the buyers per their November 30, 2016 letter. This was borne out by the paystubs issued by Colonial Oaks AL/SL to Mr. Hannie, all of which list his hire date as July 1, 1996. Moreover, Mr. Mittendorff admitted that the buyers intended to honor the employees' tenure and existing accrued vacation and time off. It is further undisputed that Mr. Hannie's employment with Colonial Oaks AL/MC was governed by the Handbook.

In rendering judgment, the trial court, as well as the parties, focused on the benefits Mr. Hannie accrued while employed by Hannie Development, as well as the credit received by the buyers in the arbitration proceeding. However, we find that the trial court was manifestly erroneous in doing so. Accordingly, we will

20

conduct a *de novo* review of the record and render a judgment on the merits. *Siverd v. Permanent Gen. Ins. Co.*, 05-973 (La. 2/22/06), 922 So.2d 497.

As per the Handbook, any accrued vacation not taken by Mr. Hannie prior to January 1, 2017, was lost as Hannie Development had a "use it or lose it" policy with regards to unused vacation hours, which prevented employees from accumulating unused vacation and rolling that time over to the next employment year. The Handbook further capped an employee's vacation time at three weeks.

Pursuant to Mr. Hannie's final Hannie Development paycheck, covering the November 20, 2016 through December 3, 2016 pay period, Mr. Hannie had 908 accrued vacation hours, for a total of 22.7 weeks of vacation. However, per the Handbook, his vacation was capped at three weeks. After he transitioned to Colonial Oaks AL/SL, Mr. Hannie received forty hours of vacation pay in his second check, covering the December 11-24, 2016 pay period. As his employment continued automatically and without interruption from Hannie Development to Colonial Oaks AL/SL, these forty hours would have been deducted from the three weeks of vacation he accrued while with Hannie Development. Thus, Mr. Hannie had two accrued weeks of vacation as of December 31, 2016, which he forfeited at the end of that day in accordance with the Handbook's "use it or lose it" policy.

However, in accordance with the Handbook, we find that Mr. Hannie was again entitled to three weeks of paid vacation as of January 1, 2017. Unlike its sick leave policy, the Handbook did not provide a formula by which vacation hours were accumulated on a monthly basis. Rather, it simply stated that an employee was eligible for three weeks of paid vacation after five years of continuous employment. Accordingly, Mr. Hannie was entitled to three weeks of paid vacation as of January 1, 2017, and as there was no evidence establishing that he

21

used any vacation time between January 1 and May 31, 2017, we find he had three weeks of accrued vacation as of May 31, 2017. Although the Handbook stated that "[f]ailure to give proper notice may result in forfeiture of accrued vacation allowances[,] and that "[e]ach employee is expected to take the vacation time earned and additional salary will not be paid in lieu of vacation[,]" we find these policies inapplicable as they would prevent Mr. Hannie from receiving the wages due him, in contravention of La.R.S. 23:631(D)(2).[8]

Accordingly, judgment is rendered in favor of Mr. Hannie, awarding him three weeks or 120 hours of accrued vacation at his hourly rate of $49.33 for a total of $5,919.60 in unpaid wages.

### Sick Leave

Colonial Oaks AL next argues that the trial court erred in awarding Mr. Hannie $14,207.04 for his accrued sick leave as the Handbook did not allow payment of this benefit at termination of employment. We agree.

The Handbook allowed an employee to accrue up to thirty-six days of sick leave. For any accrued sick leave exceeding thirty-six days, the Handbook allowed the conversion of two sick leave days to one vacation day, not to exceed five vacation days per year. The Handbook further provided that sick leave would "not be paid as terminal leave."

In *Davis v. St. Francisville Country Manor, LLC*, 13-190 (La.App. 1 Cir. 11/1/13), 136 So.3d 20, the first circuit addressed the issue of whether a paid day off qualified as an amount due pursuant to La.R.S. 23:631. In finding that it did, the court stated:

---

[8] Louisiana Revised Statutes 23:631(D)(2) provides, "The provisions of this Subsection shall not be interpreted to allow the forfeiture of any vacation pay actually earned by an employee pursuant to the employer's policy."

22

When an employer promises a benefit to employees, and employees accept by their actions in meeting the conditions, the result is not a mere gratuity or illusory promise, but a vested right in the employee to the promised benefit. *Knecht v. Board of Trustees for State Colleges and Universities and Northwestern State University*, 591 So.2d 690, 695 (La.1991). Applying this principle, the court in *Macrellis v. Southwest Louisiana Independence Center*, 94-1155 (La.App. 3rd Cir.5/3/95), 657 So.2d 135, 137, recognized that earned annual leave was an "amount then due" within the meaning of LSA-R.S. 23:631, noting that "[a]lthough the right to *enjoy* the annual leave was prospective, it became the *property* of the employee as it was earned during the first year of employment. Thus, the earned annual leave was an 'amount then due' under LSA-R.S. 23:631(A)." *See also, Beard* [*v. Summit Inst. for Pulmonary Med. & Rehab., Inc.*], [97-1784 (La. 3/4/98),] 707 So.2d [1233,] 1235.

*Id.* at 24 (footnote omitted).

While this opinion dealt with the issue of paid time off, we find it instructive on the issue of sick leave, which unlike vacation pay, is not specifically mentioned in La.R.S. 23:631.

Although the Handbook neither prevents an employee's sick leave from rolling over to the next year nor subjects it to the same "use it or lose it" policy restricting vacation time, it specifically restricts an employee from receiving sick leave as terminal leave. Thus, because sick leave was not a benefit that Colonial Oaks AL promised to pay Mr. Hannie at termination, it was not a vested right which became Mr. Hannie's property, and thus, an amount which was due under La.R.S. 23:631. Accordingly, the judgment of the trial court awarding Mr. Hannie $14,207.04 in accrued sick leave is reversed.

***Penalty Wages***

Colonial Oaks AL next argues that the trial court erred in finding that Mr. Hannie was entitled to penalty wages despite his failure to first make a demand for payment pursuant to La.R.S. 23:632. The trial court held that La.R.S. 23:631 and 23:632 no longer required the employee to first demand payment of his unpaid wages from his employer in order to receive penalty wages.

23

Louisiana Revised Statutes 23:632(A) provides in part:

> Except as provided for in Subsection B of this Section, any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages.

Thus, in order to recover penalty wages, an employee must prove "that (1) wages were due and owing; (2) demand for payment thereof was made where the employee was customarily paid; and (3) the employer did not pay upon demand." *Winkle v. Advance Prods & Sys., Inc.*, 98-694, p. 14 (La.App. 3 Cir. 10/28/98), 721 So.2d 983, 990 (quoting *Hebert v. Ins. Ctr., Inc.*, 97-298, p. 9 (La.App. 3 Cir. 1/7/98), 706 So.2d 1007, 1013, *writ denied*, 98-353 (La. 3/27/98), 716 So.2d 888). Accordingly, we find that the trial court legally erred in its interpretation of La.R.S. 23:632(A).

After performing a *de novo* review, we find that the record is void of any evidence establishing that Mr. Hannie made a demand upon Colonial Oaks AL prior to the institution of his suit. Accordingly, the judgment of the trial court awarding Mr. Hannie $35,517.60 in penalty wages is reversed.

Colonial Oaks AL further argued that it was entitled to an offset because Mr. Hannie took more time off than was allowed.

> Louisiana courts have recognized that an employer may have a claim of setoff or compensation against former employees. Employers have been allowed a setoff against a former employee's unpaid wage claim for damages pertinent to physical property or for definitive amounts of money owed by the employee for salary overpayment, loans or outstanding account balances. *See Richard v. Vidrine Automotive Services, Inc.*, 98-1020 (La.App. 1st Cir.4/1/99), 729 So.2d 1174.

*Newsom v. Global Data Sys., Inc.*, 12-412, 12-413, p. 7 (La.App. 3 Cir. 12/12/12), 107 So.3d 781, 787, *writ denied*, 13-429 (La. 4/5/13), 110 So.3d 595.

24

Thus, based on our reversal of the penalty-wage award, we need not address Colonial Oaks AL's offset claim.

***Attorney Fees***

Colonial Oaks AL further argues that the trial court was manifestly erroneous in awarding Mr. Hannie $9,000.00 in attorney fees.

In *Cleary v. LEC Unwired, L.L.C.*, 00-2532, pp. 9-10 (La.App. 1 Cir. 12/28/01), 804 So.2d 916, 923, the first circuit set out the law relative to attorney fee awards in a suit for unpaid wages:

> With regard to attorney fees, La.R.S. 23:632 provides for the award of reasonable attorney fees in the event that a plaintiff files a well-founded suit for unpaid wages. A recognized purpose of the legislative grant of attorney fees by La.R.S. 23:632 is to foster the availability of counsel to workers who have been unlawfully denied earned compensation. *Cochran v. American Advantage Mortgage Company, Inc.*, 93-1480, p. 9 (La.App. 1 Cir. 6/24/94), 638 So.2d 1235, 1240. Clearly, attorney fees are due when "to recover wages due him an employee is forced to file a well-founded suit for their payment." *Carriere v. Pee Wee's Equipment Company*, 364 So.2d 555, 556 (La.1978). The award of reasonable attorney fees is mandatory when an employee brings a "well-founded" suit for unpaid wages, irrespective of any equitable defenses that may have been raised. Suits in which the recovery of back wages is granted are considered "well-founded." *See Pokey* [*v. Five L Investments, Inc.*], 96-0018 at 11-12, 681 So.2d [489,] 496; *Glover v. Diving Services International, Inc.*, 577 So.2d 1103, 1108-09 (La.App. 1 Cir.1991). Reasonable attorney fees are to be awarded in the event that the employee files a well-founded suit for unpaid wages, even if penalty wages are not due. *Cochran*, 93-1480 at 9, 638 So.2d at 1240.

If the record fails to disclose the amount in attorney fees expended by an employee, the court may fix that amount based on its review of the record. *Winkle*, 721 So.2d 983. A trial court is vested with great discretion in determining an attorney fee award. Thus on appeal, an award of attorney fees will not be disturbed absent an abuse of discretion by the trial court. *Hanks v. La. Cos.*, 16-334 (La.App. 3 Cir. 12/14/16), 205 So.3d 1048.

25

In determining whether an attorney fee award is reasonable, the reviewing court should consider the following:

> (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge.

*Rivet v. State, Dep't of Transp. & Dev.*, 96-145, pp. 11-12 (La. 9/5/96), 680 So.2d 1154, 1161.

The only evidence presented on this issue was Mr. Hannie's testimony that he had incurred approximately $7,800.00 in attorney fees in pursuing his claim against Colonial Oaks AL. The trial court, in awarding $9,000.00 in attorney fees, stated as follows:

> In addition to his wages and penalties, Mr. Hannie is entitled to recover reasonable attorney's fees. At the hearing, Mr. Hannie testified that he had incurred about $7,800.00 in attorney's fees and court costs. The Court has not seen an itemization of the work performed by his attorney. However, in addition to presiding over the hearing, the Court has reviewed the entire record, including the numerous exceptions and memoranda filed by Colonial Oaks and the responsive pleadings and memoranda submitted by Mr. Hannie's counsel. Considering the amount of work and quality of the work, the result achieved, and the prevailing rate for legal work in this area, the Court finds that a total award of $9,000.00 is reasonable. That amount will be taxed as costs to be paid by the employer. La.R.S. 23:632(C).

Even though there was a lack of evidence on this issue, the trial court held that $9,000.00 was a reasonable amount based on its own knowledge of the amount and quality of the work provided by counsel for Mr. Hannie, the result achieved, and its knowledge of the prevailing legal-fee rate in the Lafayette area. Despite our reduction of the amount of unpaid wages awarded and the reversal of the penalty wage award, we still find that Mr. Hannie's suit was well-founded. Accordingly, we find no abuse of discretion in the trial court's award of $9,000.00 in attorney fees.

26

## MR. HANNIE'S APPEAL

### Assignment of Error Number Two

In his second assignment of error, Mr. Hannie argues that the trial court erred as a matter of law in attempting to cast an unnamed defendant, Colonial Oaks MC, in place of the named defendant, Colonial Oaks SL. He argues that the November 30, 2016 employment letter was sent by Colonial Oaks SL and that it issued the majority of his paychecks during his employment with Colonial Oaks AL/SL.

The trial court's written reasons for judgment stated that judgment was being rendered against Colonial Oaks AL/MC. We note that while the judgment presented to the trial court for signing included Colonial Oaks MC as one of the parties against whom judgment was being rendered, the trial court struck through its name. Thus, the final signed judgment named Colonial Oaks AL as the sole defendant cast in judgment. We find that this was not error as Colonial Oaks MC was never a named defendant in Mr. Hannie's suit.[9] To the extent that Mr. Hannie argues that Colonial Oaks SL should have been cast in judgment with Colonial Oaks AL, we address that issue below.

### Assignments of Error Numbers One and Three

In his first assignment of error, Mr. Hannie asserts that the trial court was manifestly erroneous in concluding that he was not employed by Colonial Oaks SL. He further argues, in his third assignment of error, that the trial court erred in omitting Colonial Oaks SL from solidary liability when it acted with the other entities as a single business enterprise, and it paid Mr. Hannie wages. As these

---

[9] "A judgment rendered beyond the pleadings is a nullity." *Monroe v. Physicians Behavioral Hosp., LLC*, 49,248, p. 21 (La.App. 2 Cir. 8/13/14), 147 So.3d 787, 798.

assignments of error are related, we will address them together using the manifest error—clearly wrong standard of review.

In light of our determination that Mr. Hannie was owed accrued vacation pay, as well as attorney fees, we must now determine whether the trial court erred by failing to cast Colonial Oaks SL in judgment along with Colonial Oaks AL, based on its finding that Mr. Hannie was not employed by Colonial Oaks SL.

In its initial pleading, Colonial Oaks AL/SL asserted a peremptory exception of no cause of action on the grounds that Colonial Oaks SL was not Mr. Hannie's employer. Prior to the trial on the merits, the trial court denied the exception, stating, "I'm going to also deny the no cause of action because, as Mr. Logan said, you must accept the allegation of this petition as true." However, following the trial on the merits, the trial court found that Mr. Hannie had not been employed by Colonial Oaks SL. In its written reasons, the trial court made the following factual findings:

> Nicol Edward Hannie was a part-owner and managerial employee of Rosewood Retirement & Assisted Living Community "Rosewood"), a joint venture of Hannie Development, Inc. and Cedar Crest, LLC. In 2016, Rosewood was sold to Seniors Investments II, LLC pursuant to an asset purchase agreement. (Exhibits A-1 and A-2). After the sale, Mr. Hannie continued to work for the purchaser until he resigned on May 31, 2017. He was initially paid by Colonial Oaks Senior Living Employer, LLC, and later, by Colonial Oaks AL Lafayette Employer, LLC and Colonial Oaks MC Lafayette [Employer], LLC (collectively referred to herein as "Colonial Oaks"). Mr. Hannie claims that Colonial Oaks wrongfully refused to pay him for the accrued vacation and sick pay that he was owed at the time of his resignation.

At the conclusion of its reasons, however, the trial court ruled in favor of Mr. Hannie against Colonial Oaks AL/MC and not Colonial Oaks SL. In a footnote, the trial court set forth its reasons supporting this decision.

> Mr. Hannie appropriately named as defendants the entities whose names first appeared on his payroll checks. However, Mr. Mittendorff's unrebutted testimony was that one of the earlier payors,

28

Colonial Oaks Senior Living Employer, LLC only performed payroll management functions for the first few weeks, and that Mr. Hannie's actual employers were Colonial Oaks AL Lafayette Employer, LLC and Colonial Oaks MC Lafayette Employer, LLC. That testimony is borne out by Mr. Hannie's more recent payroll stubs. (Exhibit J).

We cannot conclude on the record that it was manifest error for the trial court to find that Colonial Oaks SL was not Mr. Hannie's employer. Mr. Mittendorff testified at trial that Mr. Hannie's work time and efforts were split between Colonial Oaks AL/MC and that he never performed work for Colonial Oaks SL. During his testimony, the following colloquy occurred regarding this issue:

Q. Initially, the first set of checks from, which I guess, is December 30 through March 24 are checks from Colonial Oaks Senior Living Employer. Do you see that?

A. Yes, I do.

Q. And then after that, he has checks from Colonial Oaks AL. Do you see that?

A. Yes.

Q. Could you explain to the Court why the initial checks were Colonial Oaks Senior Living Employer?

A. Because he was performing some things for both communities. And so we had to allocate them between the two communities. He always did work for both communities, as I recall.

Q. And when you refer to both communities, are you referring to Colonial Oaks AL and Colonial Oaks MC?

A. Yes, Cedar Crest and Memory Care. So his employer were those two companies.

Q. Did he ever do any work for Colonial Oaks Senior Living?

A. No.

Q Was he ever supervised by anyone from Colonial Oaks Senior Living?

29

A.  He was supervised by folks at Colonial Oaks Senior Living. Those are strictly the headquarters office personnel. He was never a headquarter personnel.

Q.  Okay. Did he ever perform any functions at a facility owned by Colonial Oaks Senior Living?

A.  No.

While Mr. Hannie testified that he worked for Colonial Oaks SL and that he initially received payment from this entity, the trial court obviously credited Mr. Mittendorff's testimony over that of Mr. Hannie on this issue. It is not for us to determine credibility issues or the weight to be given to a particular witness' testimony, as those tasks fall within the purview of the trial court. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Thus, we find no manifest error in this factual conclusion.

Mr. Hannie further argues the trial court erred by failing to cast Colonial Oaks SL in judgment in addition to Colonial Oaks AL as both entities were operated as a single business entity, such that each was solidarily liable for his unpaid wages, penalty wages, and attorney fees.

In *Green v. Champion Insurance Co.*, 577 So.2d 249 (La.App. 1 Cir.), *writ denied*, 580 So.2d 668 (La.1991), the first circuit recognized the "single business enterprise" or "instrumentality" theory, in addition to the use of the "piercing the veil" theory, to extend liability beyond a separate entity. Therein, the court set forth the following non-exclusive factors to examine.

> When determining whether a corporation is an alter ego, agent, tool or instrumentality of another corporation, the court is required to look to the substance of the corporate structure rather than its form. The following factors have been used to support an argument that a group of entities constitute a "single business enterprise":
>
> 1.  corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control;

30

2.  common directors or officers;

3.  unified administrative control of corporations whose business functions are similar or supplementary;

4.  directors and officers of one corporation act independently in the interest of that corporation;

5.  corporation financing another corporation;

6.  inadequate capitalization ("thin incorporation");

7.  corporation causing the incorporation of another affiliated corporation;

8.  corporation paying the salaries and other expenses or losses of another corporation;

9.  receiving no business other than that given to it by its affiliated corporations;

10. corporation using the property of another corporation as its own;

11. noncompliance with corporate formalities;

12. common employees;

13. services rendered by the employees of one corporation on behalf of another corporation;
14. common offices;

15. centralized accounting;

16. undocumented transfers of funds between corporations;

17. unclear allocation of profits and losses between corporations; and

18. excessive fragmentation of a single enterprise into separate corporations.

*Id.* at 257-58.

In *Dishon v. Ponthie*, 05-659 (La.App. 3 Cir. 12/30/05), 918 So.2d 1132, *writ denied*, 06-599 (La. 5/5/06), 927 So.2d 317, a panel of this court applied the "single business entity" theory to extend liability beyond a separate entity, noting

31

that we had recognized but not relied on the theory in previous cases.[10] We note that in this instance, we are dealing with limited liability companies, or LLCs, as opposed to corporations. However, "[t]he doctrine of piercing the corporate veil is applicable to limited liability companies as well as corporations." *Hodge v. Strong Built Int'l, LLC*, 14-1086, p. 4 (La.App. 3 Cir. 3/4/15), 159 So.3d 1159, 1163. "Whether an affiliated group of entities constitutes a 'single business enterprise' is a question of fact to be decided by the trial court[]" and reviewed on appeal pursuant to the manifest error or clearly wrong standard. *Green*, 577 So.2d at 257.

After reviewing the record, we find no manifest error in the decision of the trial court to hold only Colonial Oaks AL liable for Mr. Hannie's unpaid wages and attorney fees. In considering the *Green* factors in relation to the matter at hand, we note that although some of the factors favored a finding that a single business enterprise existed, many of the factors were either not proven or established. Essentially, whether Colonial Oaks AL/SL was operated as a single business enterprise comes down to a weighing of Mr. Hannie's testimony over that of Mr. Mittendorff, the owner/operator of both entities. Based on the judgment rendered, the trial court credited the testimony of Mr. Mittendorff in determining that Colonial Oaks AL/SL was not a single business enterprise and that Colonial Oaks SL did not employ Mr. Hannie. Thus, we affirm the judgment of the trial court in this respect.

## DECREE

For the forgoing reasons, the judgment of the trial court in favor of Nicol Edward Hannie and against Colonial Oaks AL Lafayette Employer, LLC,

---

[10] *Haywood v. La. Sugar Cane Prods.*, 96-1151 (La.App. 3 Cir. 3/5/97), 692 So.2d 524; *Thibodeaux v. Ferrellgas, Inc.*, 98-862 (La.App. 3 Cir. 1/6/99), 741 So.2d 34, *writ denied*, 99-0366 (La. 3/26/99), 739 So.2d 797; and *Amoco Prod. Co. v. Texaco, Inc.*, 02-240 (La.App. 3 Cir. 1/29/03), 838 So.2d 821, *writ denied*, 03-1102, 03-1104 (La. 6/6/03), 845 So.2d 1096.

awarding $18,153.44 in accrued vacation/sick leave and $35,517.60 in penalty wages, is reversed, and judgment is rendered in favor of Mr. Hannie awarding him $5,919.60 in accrued vacation pay. The judgment of the trial court awarding Mr. Hannie $9.000.00 in attorney fees is affirmed, for a total award of $14,919.60 in his favor. Costs of this appeal to be divided equally between the parties.

**REVERSED IN PART AND RENDERED; AND AFFIRMED IN PART.**